**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BIOHAVEN THERAPEUTICS LTD., a British Virgin Islands corporation, and YALE UNIVERSITY, a Connecticut corporation,<br><br>      Plaintiffs,<br><br>      v.<br><br>AVILAR THERAPEUTICS, INC., a Delaware corporation, and RA CAPITAL MANAGEMENT GP, LLC, a Delaware corporation,<br><br>      Defendants. | C.A. No. 23-328-JLH-CJB<br><br>**UNDER SEAL** |
| AVILAR THERAPEUTICS, INC., a Delaware corporation, and RA CAPITAL MANAGEMENT GP, LLC, a Delaware corporation,<br><br>      Counterclaim-Plaintiffs,<br><br>      v.<br><br>BIOHAVEN THERAPEUTICS LTD., a British Virgin Islands corporation, and YALE UNIVERSITY, a Connecticut corporation,<br><br>      Counterclaim-Defendants. | |

**<u>MEMORANDUM ORDER</u>**

Scientists no doubt feel a strong sense of ownership over their scientific discoveries.  But the law provides only limited remedies when others make use of those discoveries.  Inventors whose discoveries satisfy the statutory requirements may obtain patent protection as part of a bargain: public disclosure of the invention in exchange for a temporary right to exclude others from practicing it.  In this way, science progresses as inventors and researchers build upon one another's work for the ultimate benefit of the public.  Absent patent protection, however, those who publish or otherwise disclose their discoveries effectively dedicate them to the public.  Others are free to use the information, improve upon it, and make money from it.

One who makes a valuable discovery may instead seek protection under the trade secret laws.  But unlike patent law, trade secret law protects valuable information only so long as it remains secret.  Once a scientist publishes or otherwise discloses the information, trade secret law does not protect against future use by others.  At that point, anyone may use the information.

A jury might think it unfair for Company A to take Inventor B's published discovery and exploit it without compensating Inventor B.  But absent patent protection, that conduct is generally not unlawful. To the contrary, building upon publicly disclosed research is one of the principal mechanisms by which science advances.

This is a trade secret and breach of contract case.  Pending before the Court is Defendants' Motion for Summary Judgment No. 1 (D.I. 739).  The Motion is granted.

## I.    BACKGROUND

The facts material to resolving this motion are undisputed.  The Court provides the following only to frame the issue and provide context.[1]  David Spiegel, M.D., Ph.D., is a Professor

---

[1] The Court acknowledges that the terminology used in this section is not invariably precise; it is adopted for convenience and readability rather than technical exactitude.

at Plaintiff Yale University ("Yale").  At a 2018 event called the "Yale Lifesciences Pitchfest," Dr. Spiegel gave a pitch presentation called "MODA Pharmaceuticals[,] Targeted Elimination of Pathogenic Extracellular Proteins."  (D.I. 749, Ex. 23 (Yale Pitchfest presentation).)  As the name suggests, the presentation concerned a technology to treat diseases that involve pathogenic extracellular proteins.  Dr. Spiegel called his technology "the MODA Platform."  The presentation explained the basic idea behind Dr. Spiegel's approach, which was to develop drugs designed to bind pathogenic extracellular protein molecules and cause those protein molecules to be removed from the body.  The presentation touted the "customizable" nature of the approach — that it could be adapted to treat different diseases by targeting the type of pathogenic extracellular protein present in that disease.  The pitch presentation did not contain precise details about how the technology worked, but it did contain some experimental data suggesting that it did work.  *Id.*

Representatives of Defendant RA Capital Management GP, LLC ("RA Capital") attended Dr. Spiegel's pitch presentation.  (D.I. 750, Ex. 10 at 33.)  RA Capital is an investment firm in the healthcare and life sciences industry.  RA Capital was intrigued by Dr. Spiegel's presentation and reached out to him to discuss the technology and the possibility of investment.  Representatives of RA Capital and Dr. Spiegel met on April 9, 2019.  (D.I. 781, Ex. 1 at 46–47.)  That day and the next, Dr. Spiegel disclosed certain information to RA Capital, including, among other things, that there were "[p]rovisional IP filings on both [the MODA] platform and individual products."[2]  (D.I. 749, Ex. 27 at 12.)

---

[2] A provisional patent application is a temporary placeholder filed with the U.S. Patent and Trademark Office.  35 U.S.C. § 111(b).  It secures an early "priority date."  To obtain a regular non-provisional patent, a patent application must be filed within 12 months of the provisional filing.  § 111(b)(5).  Provisional and non-provisional patent applications are not published when they are filed.  35 U.S.C. § 122(a).  But once a non-provisional patent application is filed, both the provisional and the non-provisional are made public 18 months after the priority date.  § 122(b)(1)(a).

3

On April 12, 2019, Yale and RA Capital executed a "Confidential Disclosure Agreement" ("CDA"), effective April 10, 2019, "for the sole purpose of evaluating a possible contractual arrangement between the parties." (D.I. 749, Ex. 29 ¶ 2.) The CDA generally provided that RA Capital was to keep confidential designated information provided by Yale and that RA Capital would not use the information for any purpose other than evaluating whether to enter an agreement with Yale. (*Id.* ¶¶ 1–4.) But the CDA did not require RA Capital to pursue any agreement with Yale. Rather, Yale "acknowledge[d] and agree[d]" that

> (a) [RA Capital] is an investment manager, and on behalf of its clients, interacts with and invests in numerous public and private companies including those which may be deemed competitive with the business of YALE (as currently conducted or as currently proposed to be conducted) (collectively, "Other Companies") and (b) other than as expressly set forth in this Agreement, including the non-disclosure of Confidential Information to Other Companies, [RA Capital] does not have, nor owe, any duty or obligation to YALE.

(*Id.* ¶ 8.) The CDA specified how information was to be designated as "Confidential Information": "The disclosure of the Confidential Information shall be in writing and clearly marked 'CONFIDENTIAL,' or if orally disclosed shall be reduced to writing by YALE within thirty (30) days of its disclosure." (*Id.* ¶¶ 1, 3.)

Yale, through Dr. Spiegel, then shared more information with RA Capital. Some information was disclosed via email and other information via a "Dropbox" folder created to share documents. (D.I. 749, Ex. 31; D.I. 781, Ex. 12.) Some of those documents were marked confidential in accordance with the CDA, but not all of them. On May 13, 2019, Dr. Spiegel uploaded drafts of patent applications and accompanying figures to the "RA Capital" Dropbox folder. (D.I. 749, Ex. 31; *see also* Exs. 32–50; Ex 8 at 47.) None of the documents uploaded to

the Dropbox folder on that date contained confidentiality markings, nor was the Dropbox folder labeled confidential.[3]  (*Id.* (all citations).)

Yale and RA Capital ceased negotiations in August 2019 and did not enter into a further agreement.[4]  (D.I. 771, Ex. 73.)  The patent applications that Dr. Spiegel had shared with RA Capital in May 2019 were published by the U.S. Patent and Trademark Office on October 17, 2019.[5]  (D.I. 749, Ex. 51; D.I. 750, Ex. 19.)

In 2021, Yale entered an agreement with Plaintiff Biohaven Therapeutics Ltd. ("Biohaven") to develop and commercialize Dr. Spiegel's MODA technology.  At some point, Plaintiffs discovered that RA Capital and another company, Defendant Avilar Therapeutics, Inc. ("Avilar"), were attempting to commercialize what Dr. Spiegel believed to be his technology.  (*Id.* ¶¶ 10–12, Ex. 3.)  This lawsuit followed.

Plaintiffs Yale and Biohaven allege that Defendants Avilar and RA Capital committed trade secret misappropriation (under federal and state law) and breached the CDA.  Under the Court's scheduling and case management orders, Plaintiffs were required during the course of discovery to identify a list of the trade secrets they believe were misappropriated by Defendants. *Cf. Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 906 (3d Cir. 2021); *SmithKline Beecham Pharms. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 447 (Del. 2000).  The operative "Trade Secret Identification Chart" is set forth at Exhibit 2 to D.I. 749 ("TSID").  (*See* D.I. 624 (defining "including" in the TSID to mean "more specifically").)  It lists nine purported trade secrets

---

[3] (*See also* D.I. 771, Ex. 51 (Milgrim Report) ¶ 79 (noting "Dr. Spiegel's failure to explicitly mark the . . . patent applications as 'confidential.'"); D.I. 749, Ex. 16 (Strieter Reply Report) ¶ 15 (not disputing that the applications were unmarked).)

[4] The parties may dispute certain facts about why the negotiations ceased, but those factual disputes are not material to resolving this motion.

[5] *See* FN 2, *supra*.

(referred to as TS1, TS2, etc.) along with the "key exhibits" disclosed to RA Capital that describe those alleged secrets.  (D.I. 749, Ex. 2.)

This Memorandum Order addresses Defendants' Motion for [Partial] Summary Judgment #1, which argues (among other things) that alleged Trade Secrets #1–6 were not secret and that use of that information by Defendants is not redressable under the trade secret laws.  The Court presided over two full days of oral argument on October 27 & 28, 2025.  (D.I. 884, Exs. A, B ("Tr. __").)

## II.   LEGAL STANDARDS

### A.   Summary Judgment

A party may move for summary judgment under Federal Rule of Civil Procedure 56. Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden is on the movant to demonstrate the absence of a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

"An assertion that a fact cannot be—or, alternatively, is—genuinely disputed must be supported either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials,' or by 'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'" *Resop v. Deallie*, No. 15-626-LPS, 2017 WL 3586863, at *1 (D. Del. Aug. 18, 2017) (quoting Fed. R. Civ. P. 56(c)(1)(A) & (B)).  The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves*

*v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  But a factual dispute is only genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To withstand a motion for summary judgment, the non-moving party "must point to concrete evidence in the record that supports each and every essential element of his case." *Nitkin v. Main Line Health*, 67 F.4th 565, 571 (3d Cir. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").  "[W]here a non-moving party fails sufficiently to establish the existence of an essential element of its case on which it bears the burden of proof at trial, there is not a genuine dispute with respect to a material fact and thus the moving party is entitled to judgment as a matter of law." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (citing *Lauren W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007)).

### B.      Trade Secret Misappropriation

The elements of trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA") are (1) the existence of a trade secret, defined generally as information with independent economic value that the owner has taken reasonable measures to keep secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) the misappropriation of that trade secret, defined broadly as the knowing improper acquisition, or use or disclosure of the secret.  *Oakwood*, 999 F.3d at 905 (citing 18 U.S.C. § 1839).

Information does not qualify as a trade secret if it is "readily ascertainable through proper means by[] another person who can obtain economic value from the disclosure or use of the

7

information."  18 U.S.C. § 1839(3)(B).  "[R]everse engineering, independent derivation, or any other lawful means of acquisition" does not count as misappropriation.  *Id.* § 1839(6)(B).

Delaware has adopted the Uniform Trade Secret Act.  6 Del. C. § 2001 (the "DUTSA"). Like the DTSA, a Plaintiff bringing a DUTSA claim must establish the existence of a trade secret and its misappropriation.  *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 589 (Del. Ch. 2010).

## III.   DISCUSSION

Defendants' first motion for summary judgment seeks summary judgment in Defendants' favor on Plaintiffs' trade secret misappropriation claims insofar as they are based on alleged Trade Secrets #1–6.  The parties do not make any separate arguments with respect to Plaintiffs' claims for misappropriation under the federal DTSA versus Plaintiffs' claims for misappropriation under the DUTSA.  The Court assumes, like the parties, that the state and federal misappropriation claims rise or fall together.

Plaintiffs acknowledge that alleged Trade Secrets #1–6 are all described in the patent applications that Dr. Spiegel shared with RA Capital in May 2019.  Plaintiffs also agree that, if those patent applications were not shared with RA Capital under any obligation of confidentiality, Trade Secrets #1–6 cannot form the basis of a trade secret misappropriation claim.  (Tr. at 190 ("Q: [I]f [the patent application] wasn't confidential, then was there anything — you don't have a claim for 1 through 6, right?  A: I — yes.  I think that — yes.  If you're saying . . . the patent application was not confidential and they could use it without — they could use it under the CDA, yeah, I guess I — yeah, I guess that's right.").)[6]

---

[6] Indeed, as Plaintiffs explained in oral argument, Plaintiffs and their experts consider Trade Secrets #1–6 separately from Trade Secrets #7–9 because Plaintiffs contend that the latter group was not described in Dr. Spiegel's patent applications (which were published and thus disclosed to the public in October 2019).  Plaintiff's theory of misappropriation with respect to Trade Secrets #1–6 is that RA Capital made unauthorized use of those secrets to get a head start in favor of their

So the question is: were the applications disclosed to RA Capital under any obligation of confidentiality?  The answer is: no.  The applications were not marked as confidential in accordance with the CDA.  And the CDA provides that RA Capital owed Yale no duty or obligation other than as expressly set forth in the CDA.

Plaintiffs raise a litany of counterarguments, but none carry the day.  Plaintiffs contend that the patent applications should be deemed to have been confidential because one RA Capital partner admitted in his deposition that RA Capital had discussed waiting to pursue the technology "until Spiegel's patent applications published, so that it was public information."  (D.I. 767 (Plaintiffs' Answering Br.) at 10 (citing D.I. 768 ¶ 69).)  Plaintiffs say that there would be no reason for RA Capital to consider waiting if the patent applications weren't confidential to begin with.  But an individual's subjective interpretation of a situation cannot override the plain language of a contract.  In any event, the testimony proffered by Plaintiffs does not say that RA Capital believed that the patent applications were confidential.

Plaintiffs point out that the patent applications were only shared after the parties entered into the CDA.  But so what?  The CDA specifies the procedure for designating information as confidential, and the patent applications weren't marked confidential.

Plaintiffs contend that the information in the patent applications should be deemed to be confidential because Yale shared that same information in other documents that bore a

---

own competing technology between May 2019 (when Dr. Spiegel shared the patent applications with RA capital) and October 2019 (when the applications published).  (D.I. 767 at 12; Tr. at 106 (Plaintiffs' counsel stating that "[f]or purposes of our claims and our damages, we are only looking at prepatent [publication] misappropriation for Trade Secrets 1 through 6."); Tr. at 133–34 (Plaintiffs' counsel discussing TS7–9: "And again, to talk about how these various claims relate, unlike with Trade Secrets 1 through 6, Plaintiffs do allege continuing additional acts of misappropriation after the patent application's published because Plaintiffs' position is that these were not disclosed in the patent application.").)

confidentiality designation.  I disagree.  Plaintiffs' interpretation of the CDA is unreasonable as it would put RA Capital in the untenable position of having to guess whether unmarked documents nonetheless contain information disclosed in prior marked disclosures.  The whole purpose of the marking requirement, and the requirement for Yale to reduce to writing any confidential oral disclosures, is to ensure clarity as to what information and documents are confidential.  I join other courts in rejecting the argument that Yale's duty to mark documents as confidential is relieved just because Yale earlier marked other documents as confidential.  *See, e.g.*, *Convolve, Inc. v. Compaq Comput. Co.*, 527 F. App'x 910, 924 (Fed. Cir. 2013) (rejecting argument that earlier confidential disclosures rendered subsequent disclosures confidential); *Corinthian Mortg. Corp. v. ChoicePoint Precision Mktg., LLC*, No. 7-832, 2008 WL 4276921, at *3 (E.D. Va. Sept. 11, 2008) (holding that confidentiality marking on one document did not render un-marked documents shared subsequently confidential).

Plaintiffs similarly contend that because Dr. Spiegel resent the applications to a representative from RA Capital, this time with confidentiality markings, that cured the fact that the applications were previously disclosed without confidentiality markings.  I disagree.  The CDA says what needs to be done to designate information as confidential, and RA Capital had no obligation of secrecy with respect to documents shared without a confidentiality marking.  *See, e.g.*, *Big Vision Private Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 254 (S.D.N.Y. 2014) ("The NDAs require written information to be contemporaneously designated as Confidential to qualify as such; because this information was already disclosed, it could not be designated as Confidential.").

Plaintiffs also point out that the U.S. Patent and Trademark Office is required by law to keep patent applications confidential before they are published.  That's true.  But, again, so what?  Dr. Spiegel shared the applications with RA Capital under no obligation of confidentiality.

Finally, Plaintiffs contend that the patent applications nonetheless remained confidential because Yale used "other means" to notify RA Capital that the applications were confidential. Yale never explains what these "other means" were, and points to no provision in the CDA supporting its position.[7]  Again, the CDA says what needs to be done to mark a document as confidential, and it says that RA Capital owes no other duty or obligation other than set forth in the CDA.  *See, e.g.*, *Convolve*, 527 F. App'x at 925 ("If the parties have contracted the limits of their confidential relationship regarding a particular subject matter, one party should not be able to circumvent its contractual obligations or impose new ones over the other via some implied duty of confidentiality."); *Big Vision*, 1 F. Supp. 3d at 254–55.

## IV.  CONCLUSION

For the reasons above, I agree with Defendants that alleged Trade Secrets #1–6 were disclosed to RA Capital under no obligation of confidentiality when Dr. Spiegel shared his patent applications in May 2019.  Plaintiffs cannot base a trade secret misappropriation claim on Defendants' alleged use of Trade Secrets #1–6.  *See, e.g.*, *Convolve*, 527 F. App'x at 925 (affirming dismissal of trade secret misappropriation claims where the plaintiff "did not follow the procedures

---

[7] For this reason, Plaintiffs' cited cases are distinguishable.  Plaintiffs cite a number of cases regarding other reasonable measures a party may take to maintain its trade secrets other than a confidentiality agreement.  (D.I. 767 (Plaintiffs' Answering Br.) at 11–12 (citing cases).)  But here, Plaintiffs have not explained what reasonable measures they believe Yale has taken and have not set forth any facts from which a reasonable jury could conclude that Yale took any such reasonable measures.  And even if Plaintiffs had, the Court is not persuaded that those other means could somehow override the plain terms of the CDA.

set forth in the NDA to protect the shared information, so no duty ever arose to maintain secrecy of that information").

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment No. 1 (D.I. 739) is GRANTED.

The parties filed their briefs under seal. Accordingly, I'm issuing this Memorandum Order under seal in the unlikely event that it discusses any evidence that should be under seal. To the extent that either side seeks to have any portion of this Memorandum Order redacted, the parties shall jointly submit a proposed redacted version no later than July 6, 2026, for review by the undersigned, along with a motion supported by a declaration that includes a detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). The Court intends to issue a public version of this Memorandum Order no later than July 9, 2026.

Dated: July 1, 2026

_____
Honorable Jennifer L. Hall
U.S. District Judge

12